IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| UNDER SEAL | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO: _____ |
| v. | ) | |
| | ) | **FILED UNDER SEAL** |
| UNDER SEAL | ) | |
| | ) | **DO NOT PLACE IN PRESS BOX** |
| Defendant. | ) | **DO NOT ENTER ON PACER** |
| | ) | |
| | ) | **DEMAND FOR JURY** |
| | ) | |
| | ) | |
| | ) | |

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *ex rel.* Michael A. Rehfeldt, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO: _____ |
| v. | ) | |
| | ) | **FILED UNDER SEAL PURSUANT** |
| COMPASSIONATE CARE HOSPICE | ) | |
| GROUP, INC.; COMPASSIONATE | ) | |
| CARE HOSPICE | ) | TO 31 U.S.C. §3730(b)(2) |
| OF CENTRAL GEORGIA, LLC; | ) | |
| COMPASSIONATE CARE HOSPICE | ) | **DO NOT PLACE IN PRESS BOX** |
| OF SAVANNAH, LLC; and | ) | **DO NOT ENTER ON PACER** |
| COMPASSIONATE CARE HOSPICE | ) | |
| OF LAKE AND SUMTER, INC., | ) | **DEMAND FOR JURY** |
| | ) | |
| | ) | |
| Defendants. | ) | |

## QUI TAM COMPLAINT

Relator Michael A. Rehfeldt, on behalf of himself and the United States of America, alleges and claims against Defendants Compassionate Care Hospice of Central Georgia, LLC, Compassionate Care Hospice of Savannah, LLC, Compassionate Care Hospice of Lake and Sumter, Inc., and Compassionate Care Hospice Group, Inc. (collectively "Defendants") as follows:

## JURISDICTION AND VENUE

1.      This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33 (the "False Claims Act" or "FCA").   Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.   Jurisdiction is also authorized under 31 U.S.C. § 3732(a).

2.      Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a), because Defendants qualify to do business in the State of Georgia, transact substantial business in the State of Georgia, transact substantial business in this judicial district, and can be found here. Additionally, and as described herein, Defendants committed within this judicial district acts proscribed by 31 U.S.C. § 3729 and 31 U.S.C. § 3730.   Specifically, *inter alia*, within this judicial district Defendants knowingly submitted and caused to be submitted to the United States false claims for payment for Medicare hospice services purportedly provided to patients who (i) were not terminally ill and were not eligible or appropriate for the Medicare Hospice Benefit, (ii) were never properly certified as terminally ill by a physician, or (iii) were not provided individualized care as required by Medicare Hospice Benefit conditions of payment.   Defendants made or used false records material to such false claims.   Furthermore, Defendants unlawfully retaliated against Relator Michael Rehfeldt within this judicial district due to his status as a False

Claims Act whistleblower and based upon his efforts to prevent violations of the False Claims Act.

## PARTIES

3.      Defendant Compassionate Care Hospice Group, Inc. ("CCH") was, at all times relevant herein[1], a Florida corporation with its principal place of business in Parsippany, New Jersey, and subsidiaries and affiliates in numerous states. As of February 4, 2019, its principal office is located in Baton Rouge, Louisiana.

4.      CCH is a national hospice care provider with over 2,300 employees and 53 locations nationwide and generates approximately $188 million in annual revenue.[2]

5.      Defendant Compassionate Care Hospice of Central Georgia, LLC ("CCH Georgia") is a Georgia Limited Liability Company with its principal office located in Baton Rouge, Louisiana as of February 8, 2019.

6.      Defendant Compassionate Care Hospice of Savannah, LLC ("CCH Savannah") is a Georgia Limited Liability Company with its principal office located in Baton Rouge, Louisiana as of February 8, 2019.

---

[1] *See* 2018 Florida Profit Corporation Annual Report, Compassionate Care Hospice Group, Inc., http://search.sunbiz.org/Inquiry/CorporationSearch/GetDocument?aggregateId=domp-p16000014398-2a019ada-fdcb-4554-b537-62857686001c&transactionId=p16000014398-1f666210-244b-4caf-9d8b-ab07e7d84603&formatType=PDF.

[2] *See* http://investors.amedisys.com/file/Index?KeyFile=395299420.

7.     Defendant Compassionate Care Hospice of Lake and Sumter, Inc. ("CCH Lake and Sumter") is a Florida For-Profit Corporation with its principal office located in Baton Rouge, Louisiana as of February 4, 2019.

8.     Relator Michael A. Rehfeldt (Mr. Rehfeldt or Relator) has extensive experience in the healthcare industry and is a long-time hospice employee and administrator.  In 2008, Mr. Rehfeldt was hired by Vitas HealthCare Corp. ("Vitas") to be the general manager of its San Antonio operation. On January 30, 2009, Mr. Rehfeldt filed a *qui tam* action against Vitas.[3]  In this *qui tam* action, Relator alleged that Vitas "defrauded the United States through a systematic pattern and practice of referring and enrolling non-terminal patients for hospice."[4]   In his *qui tam* Complaint, Mr. Rehfeldt alleged that prior to filing his *qui tam* Complaint he reported concerns of ineligible hospice patients and fraudulent certifications to a number of Vitas executives, including Peggy Pettit, who was then Vitas' Chief Operating Officer.[5]  Mr. Rehfedlt's *qui tam* suit was voluntarily dismissed in April 2013, and the United States Department of Justice filed its own fraud suit on behalf of the United States against Vitas. In or around October 2017, Vitas and the United

---

[3] *See Rehfeldt ex rel. United States and Texas v. Vitas Healthcare Corp., et al.*, No. 3:09-cv-00203-B (N.D. Tex.).

[4] *See Complaint*  at ¶ 16, *Rehfeldt ex rel. United States and Texas v. Vitas Healthcare Corp., et al.*, No. 3:09-cv-00203-B (N.D. Tex.).
[5] *Id. ¶ ¶ 8, 19, 20.*

States reached a high-profile, $75 million dollar settlement of the False Claims Act cases pending against Vitas.[6]

9.    On or about September 12, 2016 – prior to any general public knowledge of his status as an FCA whistleblower against Vitas hospice – CCH hired Mr. Rehfeldt to serve as Program Director for CCH Georgia in their Warner Robins, Georgia program. The position of program director was the highest managerial position in the Warner Robins office. The program director was head of the Warner Robins office and reported to CCH and CCH-Georgia.  In July 2017, Mr. Rehfeldt was assigned as Interim Program Director of CCH Savannah in CCH's Pooler program in addition to his duties as Program Director for CCH Central Georgia.  In February 2018, Relator was effectively promoted and re-assigned as the Program Director of CCH Lake and Sumter in The Villages, Florida, effective as of March 1, 2018.

10.    Relator's responsibilities as Program Director included, among other things, managing all employees in each of the aforementioned CCH office locations, hiring staff for these offices as needed, and responding to complaints made by patients and/or their families regarding hospice care provided by each of these offices.

---

[6]  https://www.justice.gov/opa/pr/chemed-corp-and-vitas-hospice-services-agree-pay-75-million-resolve-false-claims-act

11.    Relator has knowledge, through the performance of his own duties and through conversations with CCH employees and officers, CCH admitted and recertified patients to hospice who did not meet criteria for terminal diagnosis and were not hospice eligible.   As an example, around September 2016, Relator discussed approximately 20 patients' non-terminal status with CCH clinical staff and medical directors, including Dr. Mohammad Naife Al-Shroof, then the medical director of the Warner Robins program.  Dr. Al-Shroof acknowledged to Relator that he was aware that certain patients were non-terminal yet he had still certified these patients as eligible based on explicit instruction from CCH management.  Relator routinely reported these concerns to CCH Chief Executive Officer Judith Grey, including making such reports in September 2016.

12.    Through his experience as a Program Director at CCH from September 2016 to April 27, 2018, Relator learned that Defendants conducted their operations with the intent to defraud the United States by submitting claims for hospice care with complete disregard for patient eligibility, Medicare billing requirements, or compliance with other federal healthcare laws and regulations.  Specifically, Relator has knowledge that CCH falsely certified patients as terminally ill despite patients' objective clinical characteristics being directly at odds with a terminal diagnosis and that CCH allowed nonmedical personnel to review patient records to select patients who were "qualified" for hospice service.  Relator has knowledge that Defendants'

medical directors often did not participate in the certification process and at times did not attend Interdisciplinary Group Meetings at all.   At least one medical director's secretary forged the physician's signature on certifications to fraudulently certify patients as appropriate for the Medicare Hospice Benefit; yet, Defendants submitted claims to Medicare for these patients who had not been properly certified as terminally ill by a physician.   Relator additionally observed the manner and methods that CCH used to effect its fraud including utilizing marketing quotas and basing compensation on the number of patients enrolled in hospice at CCH, which incentivized personnel to accept patients onto service and keep patients on service when they were not hospice eligible.

13.   Throughout his employment with CCH, Relator reported these issues to CCH management, including directly to CEO Judith Grey.   The issues of non-terminal patients being falsely certified as qualifying for the Medicare Hospice Benefit are precisely the same issues that Relator alleged in his *qui tam* case against Vitas and that contributed to Vitas' paying $75 Million to settle these allegations.

14.   On February 4, 2019, Amedisys, Inc. ("Amedisys") announced that it had completed an acquisition of CCH. Amedisys is one of America's leading independent home health, hospice and personal care companies. The acquisition was valued at $340 million. This transaction made Amedisys the third largest hospice

provider in the nation;[7] Amedisys now cares for more than 11,000 hospice patients daily in 33 states, operating 137 hospice care centers.  CCH is marketed and operated as an Amedisys company, advertising that it is "officially part of the Amedisys family."[8]

15.    Prior to filing this Complaint, Relator voluntarily disclosed to the United States Government the information upon which this action is based.  To the extent that any public disclosure has taken place as defined by 31 U.S.C. §3730(e)(4)(A), Relator is the original source of the information for purposes of that Section.  Alternatively, Relator has knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and Relator voluntarily provided that information to the Government before filing this Complaint.  Relator is serving contemporaneously herewith a statement of the material evidence in his possession upon which his claims are based.

---

[7]   *Amedisys Closes on Acquisition of Compassionate Care Hospice*, February 4, 2019 Company Release, http://investors.amedisys.com/file/Index?KeyFile=396603957.

[8]   https://cchnet.net. Since the February 2019 acquisition, CCH lists its headquarters in Baton Rouge, Louisiana, Amedisys' corporate home. *See* 2019 Florida Profit Corporation Annual Report, Compassionate                Care                Hospice                Group,                Inc., http://search.sunbiz.org/Inquiry/CorporationSearch/GetDocument?aggregateId=domp-p16000014398-2a019ada-fdcb-4554-b537-62857686001c&transactionId=p16000014398-d3f1196c-1d83-4030-8ed3-74a909cebbb1&formatType=PDF.

## THE FALSE CLAIMS ACT

16.     The Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, provides, *inter alia*, that any person who: (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (3) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government; (4) knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government or (5) conspires to commit a violation of the False Claims Act is liable to the United States for a civil monetary penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 104–410 [1]), plus treble damages.  31 U.S.C. § 3729(a)(1)(A), (B), (C), (G).

17.     Under the FCA, (1) the terms "knowing" and "knowingly" (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud.  31 U.S.C. § 3729(b)(1).

18.   The FCA defines the term "claim" as (A) any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. 31 U.S.C. § 3729(b)(2).

19.   The FCA defines the term "obligation" as—an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment. 31 U.S.C. § 3729(b)(3).

20.   Additionally, the FCA provides relief from retaliatory actions -- (1) In general.-- Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of

lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.  31 U.S.C. § 3730(h)

21.     The anti-retaliation provision of the FCA, "Section 3730(h), added in 1986, was designed to protect persons who assist the discovery and prosecution of fraud and thus to improve the federal government's prospects of deterring and redressing crime." *Cestra v. Mylan, Inc.,* 2015 WL 2455420, at \*7 (W.D.Pa. 2015) citing *U.S. ex rel. Schweizer v. Oce N.V.,* 677 F.3d 1228, 1237 (D.C.Cir.2012)

## THE MEDICARE HOSPICE BENEFIT

### I.      Background

22.     Through the Medicare Program ("Medicare"), Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq*., the United States provides health insurance coverage for eligible citizens. Medicare is overseen by the United States Department of Health and Human Services through its Center for Medicare and Medicaid Services ("CMS").

23.     Through the Medicare Hospice Benefit, Medicare pays for hospice care for certain terminally ill patients who elect to receive such care.  *See* 42 U.S.C. § 1395d.  A patient is deemed to be terminally ill if the patient "has a medical prognosis such that his or her life expectancy is 6 months or less if the disease runs its normal course."  42 C.F.R. § 418.3.  By electing the Medicare hospice benefit,

patients waive all rights to curative care and in so doing agree to forego any Medicare coverage for curative treatment. 42 U.S.C. § 1395d; *see also* 48 Fed. Reg. 56008, 56010 (Dec 16, 1983).   A patient may at any time revoke his or her hospice election and resume Medicare Part A coverage.   Although, throughout the duration of the hospice election, all curative treatment for the terminal illness ceases. *Id.*; 42 C.F.R. § 418.28.

24.     CCH's aggressive, profit-maximizing business model represents an intrusion of greed into an institution founded upon philosophical, spiritual, and medical notions of charity and care-giving.  The impetus for the modern hospice movement in the United States is attributed to psychiatrist Dr. Elizabeth Kübler Ross, whose 1969 <u>On Death and Dying</u> is acknowledged to have altered modern perceptions about care for the terminally ill.[9]  In the 1970s, the first hospice facilities opened their doors as volunteer organizations dedicated to bringing comfort and humanity to terminal patients.  Testifying in 1975 before the U.S. Senate Special Sub-committee on Aging, Dr. Kübler Ross stated that "[w]e should not institutionalize people.  We can give families more help with home care and visiting nurses, giving the families and the patients the spiritual, emotional, and financial

---

[9] For a detailed history of the hospice movement, Medicare's hospice benefit, and enforcement efforts by the United States regarding Medicare regulations relating to hospice fraud, *see generally* Barger, James Fredrick, Life, Death, and Medicare Fraud: The Corruption of Hospice and What the Private Public Partnership Under the Federal False Claims Act is Doing About It (January 1, 2016), Georgetown University, American Criminal Law Review, Vol. 53, No. 1, 2016. Available at SSRN: https://ssrn.com/abstract=274754.

help in order to facilitate the final care at home."   In 1982, Congress created a provisional Medicare Hospice Benefit, made permanent in 1986.  By 1990, 800 hospice companies were caring for 76,491 patients, with an average length of stay of 48.4 days.

25.    From such humble, altruistic roots, hospice care has become big business.  Medicare hospice payments rose from $205 million in 1989 to $9.2 billion in 2006.

26.    Since then, the situation has gotten significantly worse. Medicare hospice payments have continued to rise and reached $17.8 billion in 2017 -- 93 percent above 2006 spending.[10]  In a 2018 report, the Department of Health and Human Services, Office of Inspector General (HHS-OIG) identified a number of common fraud schemes that negatively affect beneficiaries, their families and the integrity of the Medicare hospice benefit.   Specifically, HHS-OIG found that common fraud schemes include "enrolling beneficiaries who are not eligible for hospice care."[11]

---

[10] U.S. Department of Health and Human Services, Office of Inspector General. Hospice Deficiencies Pose Risks to Medicare Beneficiaries; OEI-02-17-00020. July 2019. https://oig.hhs.gov/oei/reports/oei-02-17-00020.pdf?utm_source=summary-page&utm_medium=web&utm_campaign=OEI-02-17-00020-PDF

[11] U.S. Department of Health and Human Services, Office of Inspector General. Vulnerabilities in the Medicare Hospice Program Affect Quality Care and Program Integrity.   OEI -02-16-00570; July 2018. p. 2; https://oig.hhs.gov/oei/reports/oei-02-16-00570.pdf

27.     Relator learned through his personal, first-hand experience and observations that CCH is among the corporations that are fraudulently using hospice as a profit center by presenting false claims for *per diem* reimbursements for Medicare beneficiaries who are not terminally ill, and whom CCH knew or should have known did not qualify for the Medicare Hospice Benefit, and by knowingly retaining overpayments from Medicare for these claims.

## II.     Hospice Benefits, Reimbursements, and Requirements.

28.     Hospice covers a broad set of palliative services for qualified beneficiaries who have a life expectancy of six months or less as determined by their physician.  *See* 42 C.F.R. § 418.22.  Hospice is designed to provide pain relief, comfort, and emotional and spiritual support to patients with a terminal diagnosis. Qualified hospice patients may receive skilled nursing services, medication for pain and symptom control, certain physical and occupational therapy, counseling, home health aide and homemaker services, short-term inpatient care, inpatient respite care, and other services for the palliation and management of the terminal illness. *See* 42 C.F.R. § 418.202.

29.     Prior to admitting a patient or billing Medicare for hospice services, a hospice must obtain written certification of terminal illness ("COTI") for each patient for each benefit period that the patient remains under the hospice's care. *See* 42 C.F.R. § 418.22(a).  The COTI must be signed by both: (a) the hospice medical

director or physician member of the patient's interdisciplinary team; and (b) the individual patient's attending physician. 42 C.F.R. § 418.22(c). This COTI must be based on a physician's clinical judgment regarding the normal course of the individual's illness. 42 C.F.R. § 418.22(b).

30.     The COTI must conform to the following requirements: (1) The certification must specify that the individual's prognosis is for a life expectancy of 6 months or less if the terminal illness runs its normal course; (2) Clinical information and other documentation that support the medical prognosis must accompany the certification and must be filed in the medical record with the written certification; and (3) The physician must include a brief narrative explanation of the *"clinical findings"* that supports a life expectancy of 6 months or less as part of the certification and recertification forms, or as an addendum to the certification and recertification forms. 42 C.F.R. § 418.22(b) (emphasis added).

31.     Additionally, prior to the start of each patient's third benefit period (at which point the patient would exceed 6 months of life from the time of their initial COTI), a hospice physician or hospice nurse practitioner must have a face-to-face encounter with each hospice patient to gather clinical findings to determine continued eligibility for hospice care. 42 C.F.R. 418.22(a)(4). The face-to-face encounter (or "face-to-face visit") must occur prior to, but no more than 30 days prior to, the third benefit period recertification and every benefit period

recertification thereafter.  "The hospice face-to-face encounter is an administrative requirement related to certifying the terminal illness.  By itself, it is not billable, as it is considered administrative."  Medicare Benefit Policy Manual Chapter 9 §40.1.3.

32.     The physician's narrative of terminal illness must reflect ***"the patient's individual clinical circumstances and cannot contain check boxes or standard language used for all patients*."**  42 C.F.R. § 418.22(b)(3)(iv) (emphasis added).

33.     All COTIs must be signed and dated by the physician(s) and must include the benefit period dates to which the COTI applies.   42 C.F.R. § 418.22(b)(5).

34.     Through Medicare and/or Medicaid (indirectly through the States), the United States reimburses hospice providers for services to qualified beneficiaries on a *per diem* rate for each day that a qualified beneficiary is enrolled. 42 C.F.R. § 418.302.  Medicare or Medicaid makes a daily payment, regardless of the amount of services provided on a given day and even on days when no services are provided. Payments are made according to a fee schedule with four base payment amounts for the four different categories of care: routine home care (RHC), continuous home care (CHC), in-patient respite care (IRC), and general in-patient care (GIC).

35.     In return for the Hospice *per diem* payment, hospices are obligated to provide patients with all covered palliative services.  *See* 42 C.F.R. § 418.202.  The hospice must design a plan of care (POC) inclusive of all covered services necessary

to meet the patient's needs.  *See* 42 C.F.R. § 418.56.  That POC must be in place prior to the hospice's submission of a Medicare bill.

### III.    The Hospice Aggregate Cap

36.    Medicare imposes on hospice providers an annual per-patient average cap for reimbursements (the "Aggregate CAP").  The Aggregate CAP is set by CMS according to federal regulations, and in 2019 stood at $29,205.44 per patient.[12]  The Aggregate CAP is not related to expenditures on individual patients.  Rather, it limits the aggregate reimbursement that a provider may receive from Medicare per patient, per year.  A hospice provider's compliance is calculated by dividing its total submitted reimbursements over a year by the number of non-duplicative patients enrolled during that year.  Thus, every first-time Medicare hospice patient enrolled increases a hospice's Aggregate CAP amount by $29,205.44.

37.    The Aggregate CAP is intended to avoid capping the number of days an individual patient may receive hospice care – in recognition that some terminally ill patients may die earlier than the expected 6 months and some terminally ill patients may unexpectedly live longer than 6 months – while recognizing that the hospice provider should not be, in aggregate, billing for its entire census of patients in excess of 6 months on average.  By refusing to limit the number of days an

---

[12]*See* https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNMattersArticles/downloads/MM10631.pdf

individual patient could remain on hospice in recognition of the inexact science of terminal prognosis, Congress did not intend to give an unlimited revenue stream to unscrupulous hospices who routinely fail – to their own benefit – to assess patients for eligibility.

38.     Medicare will not pay for hospice services provided to patients who are not terminally ill.  *See* 42 U.S.C. §1395y.

### IV.     Hospice Interdisciplinary Group, Hospice Care Planning, and Coordination of Hospice Services.

39.     A hospice provider must designate an Interdisciplinary Group ("IDG") in consultation with the patient's attending physician and must prepare a written Plan of Care ("POC") for each patient.  42 C.F.R. §418.56.  The POC must specify the hospice care and services necessary to meet the patient-specific and family-specific needs identified in the comprehensive assessment as such needs relate to the terminal illness and related conditions.  *Id*.

40.     Pursuant to 42 C.F.R. §418.56(a)(1), the IDG must include at a bare minimum:

i. a doctor of medicine or osteopathy (who is an employee or under contract with the hospice);

ii. a registered nurse;

iii. a social worker; and

iv. a pastoral or other counselor.

41.    All hospice care and services furnished to patients and their families under the Medicare Hospice Benefit must follow an individualized written POC established by the IDG in collaboration with the attending physician, the patient or representative, and the primary caregiver, in accordance with the patient's needs. 42 C.F.R. §418.56(b). All Medicare hospice providers must ensure that each patient and the primary care giver(s) receive education and training provided by the hospice as appropriate to their responsibilities for the care and services identified in the POC.  *Id*.  "The hospice must develop an ***individualized*** written Plan of Care ***for each patient***."  42 C.F.R. §418.56(c) (emphasis added).  The POC must reflect patient and family goals and interventions based on the problems identified in the initial, comprehensive, and updated comprehensive assessments.  *Id*.

42.    Pursuant to 42 C.F.R. §418.56(c), a patient's individualized POC must include all services necessary for the palliation and management of the terminal illness and related conditions, including the following:

    i.    interventions to manage pain and symptoms;

    ii.    a detailed statement of the scope and frequency of services necessary to meet the specific patient and family needs;

    iii.    measurable outcomes anticipated from implementing and coordinating the plan of care;

    iv.    drugs and treatment necessary to meet the needs of the patient;

v.    medical supplies and appliances necessary to meet the needs of the patient; and

vi.   the interdisciplinary group's documentation of the patient's or representative's level of understanding, involvement, and agreement with the plan of care, in accordance with the hospice's own policies, in the clinical record.

43.    The hospice IDG (in collaboration with the individual's attending physician, if any) must review, revise and document the individualized POC as frequently as the patient's condition requires, ***but no less frequently than every 15 calendar days****."* 42 C.F.R. §418.56(d) (emphasis added).   A revised POC must include information from the patient's updated comprehensive assessment and must note the patient's progress toward outcomes and goals specified in the POC. *Id*.

44.    Pursuant to 42 C.F.R. §418.56(e), the hospice must develop and maintain a system of communication and integration, in accordance with the hospice's own policies and procedures, to:

i.    Ensure that the interdisciplinary group maintains responsibility for directing, coordinating, and supervising the care and services provided;

ii.   Ensure that the care and services are provided in accordance with the plan of care;

iii.  Ensure that the care and services provided are based on all assessments of the patient and family needs;

    iv.    Provide for and ensure the ongoing sharing of information between all disciplines providing care and services in all settings, whether the care and services are provided directly or under arrangement;

    v.    Provide for an ongoing sharing of information with other non-hospice healthcare providers furnishing services unrelated to the terminal illness and related conditions.

45.    Additionally, it is a universal requirement of the Medicare program that all services provided must be reasonable and medically necessary.  *See* 42 U.S.C. §1395y(a)(1)(A); 42 U.S.C. § 1396, *et seq.*; 42 C.F.R. § 410.50.  Medicare providers may not bill the United States for medically unnecessary services or procedures performed solely for the profit of the provider.  *Id.*

46.    Finally, to enroll as a Medicare provider, Defendants were required to submit a Medicare Enrollment Application for Institutional Providers.  *See* CMS Form 855A.  In submitting Form 855A, Defendants made the following "Certification Statement" to CMS:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

Form CMS-855A.

47.     Defendants then billed Medicare by submitting a claim form (CMS Form 1450) to the Fiscal Intermediary (FI) responsible for administering Medicare hospice claims on behalf of the United States.  *See* CMS Form 1450.  Each time Defendants submitted a claim to the United States through the FI, Defendants certified that the claim was true, correct, and complete, and complied with all Medicare laws and regulations, including but not limited to the ones cited above.

48.     As set forth in detail below, Defendants routinely admitted and billed Medicare for hospice patients who plainly and objectively did not meet Medicare criteria for their hospice diagnosis and were not eligible or appropriate for hospice, and Defendants falsely billed the United States for these services. Additionally, Defendants knowingly made false records or statements that were material to getting these false or fraudulent claims paid by Medicare.

### V. Defendants' Corporate Integrity Agreement

49.     In January 2015, as part of a settlement with the United States Department of Health and Human Services ("HHS") to resolve allegations that CCH had submitted false claims to the Medicare program[13], Compassionate Care Hospice Group, Ltd. ("CCH Group") and Compassionate Care Hospice of New York, LLC

---

[13]     *See*     https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-settles-civil-fraud-claims-against-compassionate-care-hospice.

("CCH-New York") entered into a Corporate Integrity Agreement ("CIA")[14] with the Office of the Inspector General ("OIG") of the HHS. The False Claims Act actions encompassed by the settlement alleged, *inter alia*, that CCH had submitted fraudulent claims for reimbursement by Medicare and Medicaid for hospice nursing services not adequately provided by CCH-NEW YORK.

50.    By entering into the CIA with HHS-OIG, CCH agreed to implement certain institutional compliance measures and submit to monitoring by HHS-OIG for five years.  However, CCH's short-lived focus on compliance with the CIA apparently cut into profits and was all but abandoned by CCH's corporate leadership. [15] Specifically, when Relator's employment began with CCH in September 2016, it was clear to him that CCH and its management had once again adopted practices designed to result in higher corporate profits through the submission of false claims to the Medicare program.

51.    The Effective Date of the CIA is January 30, 2015, and it imposes compliance obligations upon CCH Group and CCH-New York for a period of five years.  In addition to requiring CCH Group and CCH-New York to establish and

---

[14] *See*  https://oig.hhs.gov/fraud/cia/agreements/Compassionate_Care_Hospice_01302015.pdf.

[15] *See also*   https://www.justice.gov/usao-ndga/pr/hospice-pay-24-million-resolve-false-claims-act-allegations. On July 6, 2017, the United States Attorneys' Office for the Northern District of Georgia announced that CCH Group and Compassionate Care Hospice of Atlanta, LLC (CCH-Atlanta) had agreed to pay $2.4 million to HHS-OIG  to resolve allegations from 2010 that CCH Group and CCH Atlanta had submitted or caused the submission of false claims to Medicare and Medicaid by engaging in improper financial relationships with contracted physicians.

maintain a robust Compliance Program, the CIA also imposes discrete obligations when CCH Group and CCH-New York learn of certain occurrences. One such provision regarding "Overpayments" states, "[i]f at any time, CCH identifies any Overpayment (defined as "the amount of money CCH has received in excess of the amount due and payable under any Federal health care program requirements"), CCH shall repay the Overpayment to the appropriate payor (*e.g.* Medicare Contractor) within 60 days after identification of the Overpayment and take remedial steps within 90 days after identification …to correct the problem, including preventing the underlying problem and the Overpayment from recurring." [16]

52.     CCH Group and CCH-New York must also promptly notify the OIG of "Reportable Events"—which include: "a Substantial Overpayment" and "a matter that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any Federal health care program for which penalties or exclusion may be authorized."[17]

53.     Additionally, CCH Group and CCH-New York must submit an Annual Report that includes, *inter alia*, a summary of Reportable Events and

---

[16] Part III, Section I., Corporate Integrity Agreement Between the Office of the Inspector General of the Department of Health and Human Services; Compassionate Care Hospice Group, Ltd.; and Compassionate Care Hospice of New York, LLC (January 30, 2015).

[17] Part III, Section J., Corporate Integrity Agreement Between the Office of the Inspector General of the Department of Health and Human Services; Compassionate Care Hospice Group, Ltd.; and Compassionate Care Hospice of New York, LLC (January 30, 2015).

.

  
Overpayments.[18]  Each Annual Report must include a certification that CCH Group and CCH-New York is in compliance with its obligations under the CIA and Settlement Agreement and that the Annual Report is accurate and truthful.[19]

54.    The CIA also establishes Stipulated Penalties for violations of the CIA. "As a contractual remedy, CCH and OIG agree that failure to comply with certain obligations as set forth in this CIA may lead to the imposition of monetary penalties."[20]  Specifically, the CIA imposes a Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) for each day CCH fails to establish and implement any of the following obligation as described in Sections III and IV including: "policies and procedures regarding the repayment of Overpayments; the repayment of Overpayments as required by Section III.I; reporting of Reportable Events."[21]  Moreover, CCH has agreed to pay a Stipulated Penalty of $50,000 for each false certification submitted by or on behalf of CCH as part of its Implementation Report, Annual Report, additional

---

[18] Part V, Section B., Corporate Integrity Agreement Between the Office of the Inspector General of the Department of Health and Human Services; Compassionate Care Hospice Group, Ltd.; and Compassionate Care Hospice of New York, LLC January 30, 2015).
[19] Part V, Section C., Corporate Integrity Agreement Between the Office of the Inspector General of the Department of Health and Human Services; Compassionate Care Hospice Group, Ltd.; and Compassionate Care Hospice of New York, LLC January 30, 2015).

[20] Part X, Section C., Corporate Integrity Agreement Between the Office of the Inspector General of the Department of Health and Human Services; Compassionate Care Hospice Group, Ltd.; and Compassionate Care Hospice of New York, LLC January 30, 2015).

[21] *Id.*

documentation to a report (as requested by the OIG), or otherwise required by the CIA.

55.     As the facts alleged in this Complaint demonstrate, CCH's corporate policies – developed while subject to the CIA – encourage and cause the submission of false claims for hospice care, are designed to obfuscate and conceal false claims, "Reportable Events" and "Overpayments" and result in false certifications on CIA required reports, including the Annual Report for at least the years of 2016, 2017 and 2018. As such, CCH is openly violating the CIA by continuously failing to comply with the CIA and materially breaching the CIA.  Further, by making false statements and records to conceal and improperly avoid or decrease obligations to pay money to the Government as required for violations of the CIA, CCH has violated the False Claims Act.  31 U.S.C. 3729(a)(1)(G).

## **DEFENDANTS' FRAUDULENT SCHEMES**

56.     Prior to Relator's employment with CCH in September 2016 through at least April 27, 2018, CCH defrauded the United States through submitting, or causing the submission of, false or fraudulent claims to Medicare for ineligible hospice patients, failing to report past overpayments for ineligible patients and reimburse Medicare for these overpayment, falsely certifying compliance with the CIA and thereby failing to report material violations of the CIA and avoiding payment obligations as required by the CIA.

57.     As a result of Defendants' submission of, or causing the submission of, claims that were knowingly false, or with reckless disregard or deliberate ignorance of their falsity, and/or their "knowing" concealment or avoidance of their obligation to the Government, the United States was damaged.

58.     Defendants acted with intentional disregard, reckless disregard, or deliberate ignorance to the statements of staff, as well as their own records, which demonstrated CCH systematically enrolled and retained patients that were ineligible for the Medicare Hospice Benefit.

59.     Consequently, relying on Defendants' material false certifications, Medicare paid Defendants monies that would not have been paid but for Defendants' false representations and Defendants retained payments that should have been reimbursed to Medicare

### Defendants Bill Medicare for Ineligible Hospice Patients

60.     Defendants systematically defrauded Medicare and Medicaid by recruiting and cycling non-qualifying patients through the hospice division. Defendants admitted patients whom it knew were chronically – not terminally – ill and were not eligible or appropriate for the Medicare hospice benefit and falsely billed the United States for their care.

61.     Almost immediately upon assuming his duties as a CCH Program Director for CCH Georgia in its Warner Robins, Georgia location, Relator learned

that Defendants had deliberately admitted and retained non-terminal patients and failed to report the overpayments for ineligible patients and reimburse Medicare for these overpayments.  In assuming his duties in September 2016 as Warner Robins Program Director, Relator found that the hospice census was made up of chronically ill, elderly patients who did not have a legitimate hospice diagnosis and that the hospice team and management were well-aware of this fact.  One strong indicator of this state of affairs was that the agency had accrued Aggregate CAP liability of over $200,000.00 – which in Mr. Rehfeldt's long experience as a hospice administrator demonstrates that a hospice has admitted a grossly inordinate number of patients who do not have a credible six month prognosis. *See* 42 U.S.C. §1395y.

62.     When Relator attended the agency IDG meeting and discussed with the team the fact that roughly one-third of the patient census did not have an actual terminal prognosis of six months or less, he found that the clinical personnel – including medical director Dr. Mohammad Naife Al-Shroof – were aware that (i) the patients did not meet Medicare guideline criteria for terminal prognosis and (ii) the team was unaware of any justifiable alternate explanation for certifying as hospice eligible this majority of patients who clearly failed to meet the Medicare guidelines.  For example, many of the patients were falsely certified  under a diagnosis of dementia but were able to walk and talk – rendering them inappropriate under the unambiguous Medicare guidelines for hospice under that diagnosis (and,

as importantly, demonstrating that such patients are not at the end-stage of their illness and should not have been put on end of life care but rather should have remained eligible for curative treatment).

63.    When Mr. Rehfeldt confronted the clinical team with the fact that the patients on service were clearly inappropriate, it became obvious that Defendants' employees were well aware of the situation but had been unable to resolve it – several team members including the Medical Director Dr. Mohammad Naife Al-Shroof insisted that they knew the patients were not terminally ill but had been pressured into consenting to the will of their their colleagues and superiors that the patients be admitted to CCH.  In reviewing the census with staff, Relator discovered that CCH still had 15 to 20 ineligible patients in hospice care who clearly did not meet criteria for terminal diagnosis and were not hospice eligible, most of whom were ambulatory patients with conversational ability who were falselsy designated as end-stage dementia patients.

64.    Prior to Relator's assuming the program director position at the Warner Robins program, the prior program director Valerie Montgomery, who had no clinical training, exercised final approval over all admissions and mandated to clinical staff, including the medical director, which patients should be admitted.

65.    Moreover, only Ms. Montgomery could approve live discharges of hospice patients – which rarely or never happened.  Without clinical training and

guided by CCH's incentives based on hospice admissions and census, Ms. Montgomery's direction of the Warner Robins programs caused numerous ineligible patients to be admitted to hospice care and resulted in habitual submission of false claims.

66.    In an effort to prevent false claims being submitted to the Medicare program, Relator reported these ineligible patients to CCH Chief Executive Officer Judith Grey and recommended that the patients be discharged from hospice and that actions be taken to repay the Medicare program.  Ms. Grey acknowledged the problem and admitted that she and CCH were already aware of ineligible patients in Warner Robins.  Nevertheless, Defendants made no effort to determine how many of the claims it had submitted for these ineligible patients were not payable or to return any of the income from these nonpayable claims to the Medicare program.  Based upon his experience in the Warner Robins agency, Relator believes that Defendants consistently – and knowingly – admitted and billed for non-terminal patients in the years prior to his arrival and continues to retain these ill-gotten funds.

67.    One of the practices that directly leads Defendants to admit ineligible patients is its aggressive marketing scheme.  Defendants solicit their hospice services directly to potential patients, their families, and physicians through sales employees known as "marketers."  The marketers were responsible for obtaining referrals for admissions to CCH hospice and were required to meet a monthly quota of

admissions or be terminated.  CCH compensation is based upon each CCH agency meeting its set quota; in other words, employees were paid on a scale that increased as the number of patients enrolled in hospice at CCH increased, which incentivized personnel to accept patients onto service and keep patients on service when they were not hospice eligible. In particular, CCH marketers' compensation is directly linked to their ability to have patients enrolled into CCH hospice.  If marketers' monthly admissions surpassed the mandatory quota required by CCH, they received bonuses directly based upon volume of admissions in excess of the required quota; if monthly admissions fell short of the mandatory quota, the marketers would be terminated.

68.     Further evidencing Defendants' scheme to pad its hospice rolls with non-terminal, chronically-ill, elderly patients without a legitimate six month prognosis was the pervasive practice of timesheet fraud.  While employed as a CCH Program Director for CCH Georgia in its Warner Robins location, Relator learned of several instances in which CCH home health aides, a chaplain, and other employees falsified their time sheets.  These CCH employees recorded patient visits that did not actually occur or recorded visits much longer than were actually performed.  Relator discovered that it was widely known throughout CCH that certain patients on hospice were chronically-ill and did not truly require hospice care.  Visiting these patients who did not require care (and sometimes declined it)

was valueless, tedious, and embarrassing to staff, many of whom eventually stopped making the visits or reducing these visits to a simple check-in with the patient.  In order to record their required hours and receive their salary, however, CCH employees resorted to falsifying the frequency of visits and amount of time spent with patients who were not actually terminally ill and thus did not require hospice care.  Relator determined that CCH administrators, including prior director Valerie Montgomery, had allowed and encouraged this practice of falsifying time sheets in order to conceal the fact that its patients did not need any care and were not legitimate hospice patients, allowing the patients to remain on Defendants' rolls as nothing more than a billing center.  Relator reported these incidents to CCH management but did not observe that CCH ever corrected these practices past issuing a written warning to those staff members who reported false time-sheets as reported by Relator.

69.    Based on the foregoing, Defendants are aware, or should have been aware, that CCH admitted and billed for non-qualifying hospice patients.

**<u>Defendants Falsified Medical Documentation and Billed for Patients Who Were Never Properly Certified as Terminally Ill</u>**

70.    Defendants submitted false claims for hospice care provided to patients who were not properly certified by a physician.  Company leadership knew that physicians did not participate actively in the certification decision.  Moreover, at various points medical directors had been completely absent for IDG meetings for

long periods and allowed secretarial employees to simply forge physician signatures, falsely certifying that the physician had made medical determinations that the patients were eligible for the Medicare Hospice Benefit. Upon being alerted to these problems by Relator, CHH engaged in an effort to cover up this impropriety and avoid repaying Medicare for the resulting improper claims.

71.    Although Defendants' hospice medical directors are required to sign patient COTIs, when the medical directors did sign patient COTIs, they solely relied on the information presented by CCH nurses and staff at IDG team meetings – which in many instances was false, as nurses were often under pressure from management to ensure that patients remained on service. CCH medical directors participated very little in the IDG process and made no independent effort to verify patient eligibility as required by 42 C.F.R. §418.56. Accordingly, their certification was only as good as the false information upon which it was based.

72.    Moreover, Relator is aware of multiple specific instances when physicians were also absent from the IDG team meetings in violation of 42 C.F.R. §418.56, and where their absence was intentionally concealed by CCH employees who forged physicians' signatures on IDG team meeting attendance sheets, or asked physicians to sign attendance sheets significantly after the meetings occurred, or even had CCH staff forge required patient narratives and COTI physician signatures.

73.    Specifically, Dr. Mohammad Naife Al-Shroof was known by CCH to regularly not attend IDG meetings and not review patient medical records.  To affect this fraud, Dr. Al-Shroof ordered his to secretary clone or largely "copy and paste" the required physician narrative and electronically sign Dr. Al-Shroof's signature on patients' COTIs – resulting in patently false certifications.

74.    It was well known in the Warner Robins location that Valerie Montgomery, the administrator prior to Mr. Rehfeldt, told the Dr. Al-Shroof that he did not have to attend the IDG meetings, and that as a result no medical director attended meetings for months.  Relator discussed this situation with Judith Grey, who claimed that the company was planning to make a repayment to Medicare for claims submitted during this period, but who changed her account and drastically reduced the amount in question when Relator sought clarification.  Furthermore, Grey encouraged the forging of IDG attendance sheets – apparently to conceal this problem and avoid repayment.

75.    For instance, on December 19, 2016, Relator reported to Judith Grey and a CCH Human Resources representative that an IDG team attendance sheet from December 2015 had been forged.  In response, Grey instructed Relator to ignore the forgeries.  Further, in October 2016, Grey requested that Relator lie about certain forged IDG team meeting attendance sheets and that he convince a CCH Warner Robins Clinical Director to lie about how often a physician attended IDG team

meetings.  Despite Relator's refusal to further such forgeries, the message was clear: the highest levels of CCH management encouraged managerial employees to manipulate records to avoid scrutiny.

76.    Along with these major flaws and false statements in the physician certification process, CCH also allowed nonmedical personnel such as Valerie Montogmery   to review patient records and to select the patients who were "qualified" for hospice service.

### Defendants' Retaliatory Actions

77.    Throughout Relator's employment at CCH, he was recognized as a valuable employee and effective Program Director, even as his efforts to solve the compliance problems at CCH were ignored or contradicted.   In fact, Relator regularly received positive performance reviews, commendations, and promotions at CCH up until he participated in a late March 2018 teleconference with two individuals he had worked with previously, including as an employee of Vitas. Specifically, CEO Judith Grey informed Relator in February 2018 that "he was the best program director in the company." Then, Relator was summarily terminated on April 27, 2018.

78.    Specifically, in a 90-day initial performance evaluation on December 20, 2016, Relator was determined by CEO Judith Grey to "Meet Expectations," "Exceed Expectations" or "Far Exceed Expectations" in all categories.  In May 2017,

then CCH COO Stacey Rowse told Relator "I am very impressed with you and your leadership and commend the program you are building in Macon.  I believe it is a true reflection of what I would like Compassionate Care to look like across the company.  I had an opportunity to discuss strong leadership within the company with Aliza and I told her about you."  Later, on July 31, 2017, CCH CEO Judith Grey sent Relator an email stating "Just wanted to reach out to you and congratulate you for a great job with the Macon office.  You have put together a great team and are making wonderful strides."

79.    Further, evidencing Relator's positive job performance, Relator was given multiple promotions while at CCH, including in February 2018 to become Program Director of Lake and Sumter/The Villages, FL – the flagship program in Florida and one of the most important programs in the CCH company.

80.    However, in or around late March 2018, Relator participated in a conference telephone call with the Florida Hospices and Palliative Care Association that was the catalyst to Relator's retaliatory termination.  As Relator and others on the call, including CCH CEO Judith Grey, introduced themselves, it became apparent that two of the participants on the conference call were familiar with Relator and his status as a whistleblower: Vitas' Executive Vice President Peggy Pettit, and Samira Beckwith from Hope Hospice.  Significantly, as mentioned above, while employed at Vitas, Relator reported his concerns about Vitas' fraudulent

conduct to Peggy Pettit.  Ms. Pettit was specifically referenced as a high-level Vitas executive that had knowledge and approved of Vitas' systematic hospice fraud as referenced in Relator's *qui tam* Complaint.[22]  Additionally, Relator had worked with Samira Beckwith when he was employed at Vitas and she was employed at Hope Hospice.

81.    Prior to this conference call, neither Judith Grey nor any other executives at CCH had knowledge that Relator had filed a *qui tam* Complaint against Vitas or the details of Relator's *qui tam* action or his status as a whistleblower.

82.    Soon thereafter, on April 27, 2018, departing from a consistently positive trajectory in Relator's employment with CCH, Relator was abruptly terminated from employment with CCH.  CCH executives Regional Program Director Rana McClelland, Chief Executive Officer Judith Grey and Head of Human Resources Robin Kaminski were present for Relator's termination either in person or by telephone conference.

83.    CCH provided a pure pretense for Relator's termination by stating Relator had inappropriately provided bonuses to CCH Marketer Felicia McMullins by transferring credit to her from another marketer.[23]  Relator disputed these

---

[22] *See Complaint at ¶ 8, 19, 20. Rehfeldt ex rel. United States and Texas v. Vitas Healthcare Corp., et al.*, No. 3:09-cv-00203-B (N.D. Tex.).

[23] On December 8, 2017, Relator requested and received approval from CCH National Director of Business Development Anthony Bolden to transfer credit to CCH Savannah Pooler program Marketer Felicia McMullins to supplement her bonus. Relator had previously changed McMullins' territory which temporarily reduced her ability to market admissions. Upon information and belief,

allegations, and explained that he had evidence that the bonuses to Ms. McMullins had been approved by CCH National Director of Business Development Anthony Bolden.  However, both Ms. Grey and Ms. Kaminski—in violation of CCH standard policy—insisted that Relator be terminated without allowing him to provide evidence to contradict the accusation.

84.    Relator, as a former CCH program director for CCH Georgia, is familiar with CCH's procedures for employee reprimands and terminations.  In fact, Relator was trained on CCH procedures for employee termination and terminated several employees during his tenure at CCH.  Therefore, Relator knows that CCH did not follow standard procedures when terminating him.  For example, it was against standard procedures to not allow Relator an opportunity to address the accusations made and reason for termination given by CCH.  Relator is not aware of any other CCH employee terminated in this manner, without an opportunity to address the accusations made and reason for termination.

85.    From the time that Relator was first employed at CCH, because of his extensive background in the hospice industry, he was acutely aware of and had concerns about ineligible patients being admitted to hospice care at CCH.

---

due to this communication between Relator and Bolden, McMullins received credit for at least one patient in February 2018.

86.     As addressed *supra*, Relator sought to prevent false claims from being submitted to the Medicare program by alerting CCH that a significant percentage of patients did not qualify for the Medicare Hospice Benefit and sought discharge of non-qualifying patients.  Relator further sought to prevent false claims from being submitted to the Medicare program by reporting and seeking to correct material deficiencies in CCH's administration of its hospice program, including medical directors not attending IDG meetings, medical directors instructing their secretaries to forge their signature on COTIs, staff members forging IDG attendance and time-sheet fraud indicative of non-terminal patients on CCH's census.

87.     Based on Relator's reporting and prevention of false claims at CCH and upon CCH's recent knowledge that Mr. Rehfeldt had previously filed a *qui tam* suit against another hospice company where he had worked previously (and that he had specifically named colleagues of CCH leadership in his *qui tam* Complaint) for some of the same conduct he was reporting as problematic at CCH, CCH terminated Relator's employment and created a thin pretext to hide its unlawful retaliation. Therefore, Relator was terminated because of lawful acts in furtherance of his *qui tam* action against Vitas and his efforts to stop CCH from submitting false claims to the Medicare program in violation of 31 U.S.C. § 3730(h).

88.     By and through all of the circumstances described, *supra*, Defendants have violated the False Claims Act.

## COUNT ONE
## PRESENTING OR CAUSING TO BE PRESENTED FALSE CLAIMS
## UNDER 31 U.S.C. § 3729

89.   Relator adopts and incorporates paragraphs 1-88 as though fully set forth herein.

90.   By and through the fraudulent schemes described herein, Defendants knowingly—by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information—presented or caused to be presented false or fraudulent claims to the United States for payment or approval, to wit:

(a)   Defendants submitted false claims for hospice care provided to patients whom Defendants knew did not meet Medicare or Medicaid requirements for Hospice, in violation of 42 U.S.C. §1395y;

(b)   Defendants submitted false claims for hospice care provided to patients who were not properly certified by a physician and in the absence of a legitimate care plan as required by 42 C.F.R. §§ 418.22(b) and 418.56; and

(c)   Defendants submitted false claims for hospice services premised upon Defendants' fraudulent certifications of compliance with Medicare regulations as made on CMS Forms 885A and 1450 and elsewhere.

91.     Relying on Defendants' false statements and certifications, the United States paid the false claims that it otherwise would not have paid.

92.     Defendants' fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to be submitted false claims to the United States through fraudulent certification and re-certification of hospice patients and fraudulent billing of the United States through Medicare or Medicaid.

93.     Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendants by the United States through Medicare and Medicaid for such false or fraudulent claims.

WHEREFORE, Relator demands judgment in his favor on behalf of the United States, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

## COUNT TWO
## MAKING OR USING FALSE STATEMENTS OR RECORDS MATERIAL TO A FALSE CLAIM UNDER 31 U.S.C. § 3729

94.     Relator adopts and incorporates paragraphs 1-88 as though fully set forth herein.

95.     By and through the fraudulent schemes described herein, Defendants knowingly—by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information—made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States, to wit:

(a)     Defendants created and used false certifications of terminal illness; false patient care plans not calculated to cope with patients' actual needs and conditions; and other false records intended to support its fraudulent billing to the United States, all in violation of 42 U.S.C. §1395y and the Medicare regulations cited *supra*.

(b)     Defendants made false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid, including false certifications on CMS Forms 885A and 1450 as described *supra*, when Defendants were aware that the practices as described herein were in violation of Medicare payment prerequisites, including but not limited to 42 U.S.C. §1395y and the applicable LCDs.

96.    The false records or statements described herein were material and directly impacted the decision to pay the false claims submitted, or caused to be submitted, by Defendants to the United States.

97.    In reliance upon Defendants' false statements and records, the United States paid false claims that it would not have paid if not for those false statements and records.

98.    Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendants and others by the United States for such false or fraudulent claims.

WHEREFORE, Relator demands judgment in his favor on behalf of the United States, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

## COUNT THREE
## "REVERSE FALSE CLAIMS" UNDER 31 U.S.C. § 3729(a)(1)(G)

99.    Relator adopts and incorporates paragraphs 1-88 as though fully set forth herein.

100.   By and through the fraudulent schemes described herein, Defendants knowingly—by actual knowledge or in deliberate ignorance or with reckless

disregard of the truth or falsity of the information—made, used, or caused to be made or used, a false records or statement material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the United States, to wit:

(a)     Defendants knew that they had received hospice *per diem* payments for patients who did not qualify for hospice, yet Defendants took no action to satisfy their obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States;

(b)     Defendants knowingly concealed their obligations to the United States to repay or refund those payments by terminating Relator's employment because he represented a threat to disclose the obligations to repay or refund payments;

(c)     Defendants knew that they were in material violation of the terms of the CIA and that, had the United States known of such violation, Defendants would have been required to pay significant Stipulated Penalties to the United States and would have been excluded from the Medicare program. Nevertheless, Defendants concealed their material violations of the CIA and continued to submit false claims to the United States.

101.   As a result of Defendants' fraudulent conduct, the United States has suffered damage in the amount of funds that belong to the United States but are improperly retained by Defendants.

WHEREFORE, Relator demands judgment in his favor on behalf of the United States, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

### COUNT FOUR
### MATERIAL BREACH OF CORPORATE INTEGRITY
### AGREEMENT AND FALSE CLAIMS UNDER 31 U.S.C. § 3729

102.   Relator adopts and incorporates paragraphs 1-88 as though fully set forth herein.

103.   By and through the fraudulent and retaliatory schemes described herein, Defendants have materially breached the CIA. *See* CIA Part X, Section D. Such material breaches included repeated and/or flagrant violations of the obligations under the CIA and failure to report a Reportable Event, take corrective action, and make appropriate refunds as required by the CIA. *Id.*

104.   According to the CIA, these material breaches of the CIA constitute an independent basis for Defendants' exclusion from participation in the Federal health care programs. *Id.* As a result, Defendants' continued submission of claims to the

Medicare program are in violation of the False Claims Act, and the claims thus submitted are false or fraudulent.

WHEREFORE, Relator demands judgment in his favor on behalf of the United States, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

## COUNT FIVE
## FAILURE TO COMPLY WITH CORPORATE INTEGRITY AGREEMENT

105.   Relator adopts and incorporates paragraphs 1-88 as though fully set forth herein.

106.   By and through the fraudulent and retaliatory schemes described herein, Defendants have failed to comply with certain obligations of the CIA that incur imposition of stipulated monetary penalties. *See* CIA Part X, Section A. Such failure to comply includes failure to report Reportable Events and submission of false certifications by or on behalf of Defendants on required Annual Reports. *Id.*

107.   As a result of Defendants' fraudulent conduct, Defendants are subject to stipulated penalties as provided by CIA Part X, Section A, including a Stipulated Penalty of $2,500 for failure to implement reporting of Reportable Events; a Stipulated Penalty of $50,000 for each false certification submitted by or on behalf

of Defendants as part of their Implementation Report or Annual Report; and a Stipulated Penalty of $1,000 for each day Defendants failed to comply fully and adequately with any obligation of the CIA. *Id.*

WHEREFORE, Relator demands judgment in his favor on behalf of the United States, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3730(c)(5), including attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

## COUNT SIX
## RETALIATION UNDER 31 U.S.C. 3730(h)

108.  Relator adopts and incorporates paragraphs 1-88 as though fully set forth herein.

109.  Defendants knowingly discriminated against and discharged Relator because of lawful acts done by the Relator in furtherance of a False Claims Act action.

110.  Defendants knowingly discriminated against and discharged Relator because of lawful acts done by the Relator in an effort to stop violations of the False Claims Act.

111.  As a result of Defendants' retaliatory conduct, Relator has suffered damages of extended periods of lost pay, irreparable harm to his personal and

professional reputation, undue hardship forced upon Relator and his family, and extended infliction of emotional distress upon Relator and his family.

WHEREFORE, Relator demands judgment in his favor and against Defendants, in an amount of two times the amount of back-pay accrued since Relator's termination, interest on that back-pay, and compensation for special damages caused by Defendants' discrimination, including litigation costs and attorneys' fees as permitted by 31 U.S.C. § 3730(h)(2).

Date:  July 29 2019.


/s/ Benjamin P. Bucy
JAMES F. BARGER JR.
J. ELLIOTT WALTHALL
ELISE MAY FROHSIN
BENJAMIN P. BUCY

Attorneys for Relator Michael A. Rehfeldt

**OF COUNSEL**

FROHSIN, BARGER & WALTHALL
100 Main Street
St. Simons Island, Georgia 31522
Tel:   205.933.4006
Fax:   205.933.4008


**RELATOR DEMANDS A TRIAL BY STRUCK JURY**

## CERTIFICATE OF SERVICE

On or before the 7th day of August, 2019, Relator hereby certifies that in compliance with Rule 4 of the Federal Rules of Civil Procedure, service of the *Qui Tam* Complaint has been executed as follows:

By Certified Mail to:
United States Attorney for the Middle District of Georgia
Attn: Assistant United States Attorney Todd Swanson
300 Mulberry Street,
Macon, Georgia 31201

By Certified Mail to:
Attorney General of the United States
U.S. Department of Justice
Attn: Civil Frauds Division
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001