# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### MACON DIVISION

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **Michael A. Rehfeldt,** | |
| *Plaintiff,* | |
| **v.** | |
| **COMPASSIONATE CARE HOSPICE GROUP, INC.; COMPASSIONATE CARE HOSPICE OF CENTRAL GEORGIA, LLC; COMPASSIONATE CARE HOSPICE OF SAVANNAH, LLC; and COMPASSIONATE CARE HOSPICE OF LAKE AND SUMTER, INC.,** | **CIVIL ACTION NO. 5:19-cv-00304-TES** |
| *Defendants.* | |

## ORDER

Plaintiff Michael A. Rehfeldt ("Plaintiff"), on behalf of himself and the United States, filed this *qui tam* action against his former employer, Compassionate Care Hospice and its subsidiaries ("Defendants" or "CCH") [1], for alleged violations under the False Claims Act (the "FCA"), 31 U.S.C. §§ 3729–33 *et seq.* [Doc. 1]. Since that original filing, Plaintiff voluntarily dismissed all claims alleged on behalf of the United States. [Doc. 33]; [Doc. 34]. So, Plaintiff's only remaining claim is for unlawful retaliation in violation of the anti-

---

[1] The named Defendants in this action include the following entities: Compassionate Care Hospice Group, Inc., Compassionate Care Hospice of Central Georgia, LLC, Compassionate Care Hospice of Savannah, LLC, and Compassionate Care Hospice of Lake and Sumter, Inc. In this Order, the Court will collectively refer to these entities as either "Defendants" or "CCH."

retaliation provision of the FCA. *See* 31 U.S.C. § 3730(h). Defendants now move to dismiss this last claim pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* [Doc. 28-1, pp. 23–25]. For the reasons discussed below, the Court **GRANTS** Defendants' Motion to Dismiss [Doc. 28].

## I.   <u>BACKGROUND</u>

### A.   *Qui Tam* **Action against Vitas Healthcare Corporation**

For purposes of ruling on this matter, it is first necessary to detail Plaintiff's alleged involvement in a *qui tam* action against a different hospice care provider—Vitas HealthCare Corporation ("Vitas"). In 2008, Plaintiff began his employment with Vitas as the general manager of its San Antonio hospice facility. [Doc. 1, ¶ 8]. During his employment, Plaintiff claims that he reported concerns to management about the facility's admission of ineligible patients for hospice care and the false certification of patient eligibility for Medicare hospice benefits. [*Id.*]. Specifically, he alleges that he reported such concerns to Vitas' then-Chief Operating Officer Peggy Pettit. [*Id.*]. On January 30, 2009, Plaintiff filed a *qui tam* action against Vitas alleging that the hospice care provider "defrauded the United States through a systematic pattern and practice of referring and enrolling non-terminal patients for hospice." [*Id.* (quoting *Complaint* at ¶ 16, *Rehfeldt ex rel. United States and Texas v. Vitas Healthcare Corp., et al.*, No. 3:09-cv-00203-B (N.D. Tex.)]. Four years later, in April 2013, Plaintiff voluntarily dismissed his *qui tam* action against Vitas. [Doc. 1, ¶ 8]. The United States Department of Justice then filed its own suit (on behalf of the United States) against Vitas for its alleged fraudulent conduct. [*Id.*]. Around October 2017, the United States and

Vitas "reached a high-profile, $75 million dollar settlement of the False Claims Act cases pending against Vitas." [*Id.*]. Plaintiff's *qui tam* action was not involved in this settlement. [*Id.* at n.6].

### B.    Plaintiff's Employment with Compassionate Care Hospice

Following his employment with Vitas, Plaintiff went to work for another hospice care provider. The following facts surrounding Plaintiff's employment with this provider largely constitute the basis for his present action. In September 2016, Plaintiff gained employment with Compassionate Care Hospice ("CCH") as Program Director at its Warner Robins facility—the highest managerial position offered at that facility. [*Id.* at ¶ 9]. In this role, Plaintiff was responsible for "managing all employees", "hiring staff for [the] office[] as needed", and "responding to complaints made by patients and/or their families regarding hospice care[.]" [*Id.* at ¶ 10]. As the "head of the [Warner Robins] office," he reported to CCH and CCH-Georgia. [*Id.* at ¶ 9]. In addition to his role as Program Director at the Warner Robins facility, Plaintiff also served as Interim Program Director at the CCH Savannah facility from July 2017 to March 2018. [*Id.*]. Ultimately, in February 2018, Plaintiff was reassigned to serve as Program Director at the CCH Lake and Sumter facility in Florida. [*Id.*].

Plaintiff alleges that during his employment with Defendants, he learned that its facilities admitted patients who were not eligible for hospice treatment. [*Id.* at ¶ 11]. Yet, Plaintiff alleges that Defendants still billed Medicare for hospice services provided to these ineligible patients. [*Id.* at ¶ 12]. In support of this broad allegation, Plaintiff claims that he

observed and reported the following examples of fraudulent behavior. First, in September 2016, Plaintiff claims that he spoke to the then-medical director of the Warner Robins facility, Dr. Mohammad Naife Al-Shroof, about the admittance of approximately 20 patients who were not terminally ill and therefore not eligible for hospice care. [*Id.* at ¶ 11]. Dr. Al-Shroof apparently confirmed to Plaintiff that certain patients were certified as non-terminal and admitted into the program, but only upon explicit instruction from CCH management. [*Id.*]. Within that same month, Plaintiff reported his concerns about this practice to CCH Chief Executive Officer Judith Grey ("Ms. Grey). [*Id.* at ¶ 11]. He specifically alleges that he recommended to Ms. Grey that CCH management discharge these wrongly admitted patients from hospice care and take action to refund the federal payments it received for the admittance of such patients back to the Medicare program. [*Id.* at ¶¶ 11, 66].

Furthermore, as it relates to Dr. Al-Shroof, Plaintiff claims that the medical director did not attend Interdisciplinary Group ("IDG") team meetings or review patient medical records. [*Id.* at ¶ 73]. Plaintiff claims that hospice care providers are statutorily required to designate teams of healthcare professionals—an IDG—to oversee a hospice patient's treatment plan. [*Id.* at ¶¶ 39–45]. Accordingly, he claims that Defendants allowed Dr. Al-Shroof and other medical professionals to miss these meetings in direct violation of 42 C.F.R § 418.56. [*Id.* at ¶¶ 72–73]. Then, to make matters worse, Plaintiff alleges that these the absences were intentionally concealed by medical personnel who forged physicians' signatures on IDG team meeting attendance sheets. [*Id.*]. Plaintiff claims that he brought this issue to Ms. Grey's attention, who informed him that CCH management intended to

repay Medicare for the claims it wrongly submitted. [*Id.* at ¶ 74]. As to the alleged forgery

on IDG attendance sheets, Plaintiff maintains that Ms. Grey encouraged such behavior to

avoid repayment obligations. [*Id.*]. Then, in December 2016, Plaintiff reported that the

December 2015 IDG attendance sheet had been forged. [*Id.* at ¶ 75]. According to Plaintiff's

Complaint, Ms. Grey told Plaintiff to ignore the forgeries. [*Id.*]. She also apparently

requested that Plaintiff lie about other forged IDG team meeting attendance sheets. [*Id.*].

Plaintiff claims he refused to lie about the forgeries. [*Id.*].

Beyond the aforementioned examples, Plaintiff also claims that CCH medical

directors participated very little in the IDG process and made no independent effort to

verify patient eligibility for hospice care. [*Id.* at ¶ 71]. On an undisclosed date, he observed a

secretary forge a physician's signature to certify a patient for Medicare hospice care. [*Id.* at

¶ 12]. He also broadly asserts that Defendants utilized aggressive marketing schemes, such

as marketing quotas,[2] to admit ineligible patients for hospice care. [*Id.* at ¶ 67]. Once again,

Plaintiff claims that he reported such issues to CCH management and specifically to Ms.

Grey. [*Id.* at ¶ 13].

## C.   Plaintiff's Termination by CCH Management

As it relates to his job performance, Plaintiff contends that he received multiple

promotions during his employment with CCH and was "recognized as a valuable

---

[2] Plaintiff alleges that Defendants admitted ineligible patients through an "aggressive marketing scheme[]
[whereby] Defendants solicit their hospice services directly to potential patients, their families, and
physicians through sales employees known as 'marketers.'" [Doc. 1, ¶ 67]. Allegedly, these marketers
were expected to meet monthly quotas regarding admitted patients or else risk termination. [*Id.*].

employee and effective Program Director[.]" [*Id.* at ¶¶ 77–79]. He claims that he received

such high praise by CCH management up until March 2018 when he participated in a

telephone conference with two individuals that he claims knew about his 2009 *qui tam*

action against Vitas. [*Id.* at ¶ 80]. Up until the date of this conference call, Plaintiff alleges

that CCH management was completely unaware of his former status as an FCA

whistleblower. [*Id.* at ¶ 81]. He contends that shortly after this conference (and in spite of

his otherwise exemplary employment record) he was terminated by CCH management. [*Id.*

at ¶ 82]; *see also* [*Id.* at ¶ 80 ("[Plaintiff] participated in a conference telephone call . . . that

was the catalyst to [his] retaliatory termination.")].

  The Court pauses in its recitation of the facts to merely note that Plaintiff does not

provide much detail regarding the specifics of this telephone conference. The facts are quite

sparse on the matter. From the pleading, it appears that Plaintiff participated in a telephone

conference in late March 2018 with the Florida Hospices and Palliative Care Association.

[*Id.* at ¶ 80]. Ms. Grey was present for the call. [*Id.*]. As other participants joined the

conference call, Plaintiff became aware that two of the participants "were familiar with

[him] and his status as a whistleblower: Vitas' Executive Vice President Peggy Pettit[] and

Samira Beckwith from Hope Hospice." [*Id.*]. Plaintiff bases his belief that these two

participants knew of his whistleblower status on the fact that he had reported his concerns

about Vitas' fraudulent behaviors to Peggy Pettit when he was employed there. [*Id.*]. And,

as to Samira Beckworth, Plaintiff merely alleges "that he had worked with [her] when he

was employed at Vitas and she was employed at Hope Hospice." [*Id.*]. Plaintiff does not

provide any other facts to establish how this individual knew of his whistleblower status. Similarly, Plaintiff did not provide any facts in his Complaint regarding the content of the telephone conference.

Then, on April 27, 2018, Defendants terminated Plaintiff's employment. [*Id.* at ¶ 82]. There were several CCH executives present for his termination—including Ms. Grey. [*Id.*]. According to Defendants, Plaintiff was terminated because he inappropriately gave bonuses to a CCH marketer by "transferring credit to her from another marketer." [*Id.* at ¶ 83]. Plaintiff does not dispute that he transferred credit to the marketer but claims that he had a valid reason for the transfer, and it had been approved by the appropriate authority. [*Id.*]. His contention lies with the fact that CCH management did not allow him the opportunity to explain this reason before terminating him, which he claims violates Defendants' standard policy. [*Id.*]. Plaintiff disputes the reason for his termination as pretext and claims the telephone conference was the ultimate catalyst for his termination. [*Id.*].

## II.   LEGAL STANDARD

Defendants seek to dismiss Plaintiff's unlawful retaliation claim for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* [Doc. 28-1, pp. 23–25]. At the pleading stage, a complaint alleging unlawful retaliation under the FCA must comply with those pleading requirements set forth in Federal Rule of Civil Procedure 8(a)(2). *See Reddick v. Jones*, No. 1:14-CV-0020-AT, 2015 WL 1519810, at *3 (N.D. Ga. Mar. 11, 2015) (citation omitted) ("A claim brought pursuant to the FCA's anti-retaliation provision does not

depend on allegations of fraud, and thus, a complaint alleging retaliation need only contain a short and plain statement of the claim showing that [the plaintiff] is entitled to relief.")].

When a complaint fails to state such a claim, then it is subject to dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). However, a complaint survives a Rule 12(b)(6)-based motion if it alleges sufficient factual matter (accepted as true) that states a claim for relief that is plausible on its face. *McCullough v. Finley*, 907 F.3d 1324, 1333 (11th Cir. 2018) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009)). Furthermore, in ruling on a motion to dismiss, the court must construe the facts pleaded in the complaint in the light most favorable to the plaintiff. *Timson v. Sampson*, 518 F.3d 870, 872 (11th Cir. 2008), cert. denied, 129 S. Ct. 74 (2008).

Although Federal Rule of Civil Procedure 8 does not require detailed factual allegations, it does require "more than [ ] unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *McCullough*, 907 F.3d at 1333 (citation omitted). The issue to be decided when considering a motion to dismiss is not whether the claimant will ultimately prevail, but "whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Davis v. Scheuer*, 468 U.S. 183 (1984). The factual allegations in a complaint "must be enough to raise a right to relief above the speculative level" and cannot "merely create[] a suspicion [of] a legally cognizable right of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (second alteration in original). Finally, complaints that tender "'naked assertion[s]' devoid of 'further factual enhancement'" will not survive against a motion to dismiss. *Iqbal*, 556 U.S.

8

at 678 (quoting *Twombly*, 550 U.S. at 557) (alteration in original). Stated differently, the

complaint must allege enough facts "to raise a reasonable expectation that discovery will

reveal evidence" supporting a claim. *Twombly*, 550 U.S. at 556. Having outlined the relevant

standard, and taking the facts asserted in Plaintiff's Complaint as true, the Court now rules

on Defendants' Motion to Dismiss.

### III.   DISCUSSION

Plaintiff claims that the reason given by CCH management regarding his

termination was merely a "thin pretext to hide [CCH's] unlawful retaliation" against him

for filing a *qui tam* action against his former employer, Vitas, and his efforts to prevent CCH

from submitting false claims to the Medicare program. [Doc. 1, ¶ 87]. Plaintiff seeks

recovery under the anti-retaliation provision of the FCA. *See* 31 U.S.C. § 3730(h).

Defendants move to dismiss this action on the basis that Plaintiff has failed to sufficiently

plead all elements necessary to state a viable retaliation claim under the statute. *See generally*

[Doc. 28]. To resolve whether Plaintiff has sufficiently pled such a claim, the Court first

considers the relevant statutory framework.

### A.   Pleading a Retaliation Claim under the FCA

An employee who suffers an adverse employment action for attempting to expose

fraudulent conduct perpetrated by his employer against the United States, may pursue

relief under the anti-retaliation provision of the FCA. The relevant provision states that

> [a]ny employee, contractor, or agent shall be entitled to all relief necessary to
> make that employee, contractor, or agent whole, if that employee, contractor,
> or agent is discharged, demoted, suspended, threatened, harassed, or in any

other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under [the False Claims Act] or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h). To summarize, a plaintiff must plead facts to show that he was unlawfully discriminated against in the terms and conditions of his employment for engaging in a protected activity. *United States ex rel. Chase v. HPC Healthcare, Inc.*, 723 F. App'x 783, 791 (11th Cir. 2018); *see also Mack v. Augusta-Richmond Cnty.*, 148 F. App'x 894, 896–97 (11th Cir. 2005). The plaintiff is also required to "establish a causal connection between the retaliation and the protected activity; that is, [h]e must show that the retaliation was 'because of' the protected activity." *Chase*, 723 F. App'x at 792. Of course, it only makes sense that to establish this causal connection, the plaintiff must show that the person or entity engaging in the retaliatory conduct knew about the protected conduct. *Id. (citing United States ex rel. Sanchez v. Lymphatx*, 596 F.3d 1300, 1304 (11th Cir. 2010)).

As it relates to this action, there is no question that Plaintiff has sufficiently alleged unlawful discrimination by claiming that his employer terminated him. *See* 31 U.S.C. § 3730(h)(1) (citing discrimination to include "discharge").[3] However, there is a question as to whether Plaintiff has sufficiently pled the other elements necessary to state a claim under the anti-retaliation provision of the FCA. Defendants present two main arguments in support of a dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6). First, Defendants argue that Plaintiff failed to sufficiently allege that he engaged in protected

---

[3] It does not appear that Defendants challenge the sufficiency of Plaintiff's allegation that he was terminated. *See* [Doc. 28].

activity. *See generally* [Doc. 28-1, pp. 23–25]. Next, Defendants argue that even if Plaintiff had alleged protected activity, he still failed to plead facts showing a causal connection between it and the alleged discrimination—his termination. [*Id.*]. As Defendants appropriately note, a failure to adequately plead either element dooms Plaintiff's retaliation claim.

Since Plaintiff alleges that he engaged in more than one form of protected activity—but suffered only one ultimate act of retaliation as a result—the Court finds it better to first outline the relevant caselaw defining protected activity and causal connection. Upon providing such an outline, the Court will then analyze whether any of Plaintiff's *alleged* protected activity *actually* constitutes protected activity. Then, within that same analysis, the Court will analyze whether the facts sufficiently allege a causal connection. Central to this analytical outline is the understanding that even if Plaintiff sufficiently alleges protected activity, his retaliation claim will still fail as a matter of law, if he does not also sufficiently allege a causal connection between it and his termination.

1. <u>Protected Activity</u>

The first element of a claim under the anti-retaliation provision of the FCA requires a plaintiff to sufficiently plead that he engaged in protected activity. Protected activity is defined as either (1) "lawful acts done by the employee . . . in furtherance of an action under [the False Claims Act], or (2) "other efforts to stop 1 or more violations of [the False Claims Act]." *Chase*, 723 F. App'x at 791 (quoting 31 U.S.C. § 3730(h)). The first prong of this provision "provides an avenue for employees to report violations of the statute related to

*qui tam* actions." *Katterheinrich v. Al-Razaq Computing Servs.*, No. 5:17-cv-1797-LCB, 2020 WL
5847648, at *5 (N.D. Ala. Oct. 1, 2020). In fact, "[t]he prototypical example of conduct
protected by the FCA is the filing of an FCA claim[]" through avenues such as a *qui tam*
action. *Ortino v. Sch. Bd. of Collier Cnty.*, No. 2:14-cv-693-FtM-29CM, 2015 WL 1579460, at *2
(M.D. Fla. Apr. 9, 2015) (citing *Sanchez*, 596 F.3d at 1303.). A *qui tam* action is one in which a
private citizen pursues a civil action on behalf of the United States to recover losses caused
by fraudulent acts committed by his employer against the United States. *United States ex rel.
Heller v. Guardian Pharmacy, LLC*, No. 1:18-cv-03728-SDG, 2021 WL 488305, at *4 (N.D. Ga.
Feb. 10, 2021). However, to sufficiently allege protected activity, a plaintiff is not required to
show that he filed a *qui tam* action against his employer. *Childree v. UAP/GA Chem, Inc.*, 92
F.3d 1140, 1146 (11th Cir. 1996). Rather, under this first prong, the relevant inquiry is merely
whether there was at least a distinct possibility that an FCA claim could be asserted against
an employer at the time the employee acted. *Sanchez*, 596 F.3d at 1303 (citing *Childree*, 92
F.3d at 1146). The Eleventh Circuit has provided guidance on how district courts can
appropriately apply this 'distinct possibility' standard. "If an employee's actions, as alleged
in the complaint, are sufficient to support a reasonable conclusion that the employer could
have feared being reported to the government for fraud or sued in a *qui tam* action by the
employee, then the complaint states a claim for retaliatory discharge under § 3730(h)."
*Sanchez*, 596 F.3d at 1304 (comparing *Mann v. Olsten Certified Healthcare Corp.*, 49 F. Supp. 2d
1307, 1314 (M.D. Ala. 1999)).

There is a second prong to this statutory provision, but the Eleventh Circuit has not yet articulated a definite standard for the district courts to apply. *See Hickman v. Spirit of Athens, Alabama, Inc.*, 985 F.3d 1284, 1288 (11th Cir. 2021) (declining to hold what standard applies for would-be plaintiffs alleging they engaged in "efforts to stop" FCA violations). This "other efforts" prong was an amendment to the original anti-retaliation provision, and it clearly expanded the definition of protected activity. "In other words, the amendment[] expanded retaliation coverage to at least some set of people who make 'efforts to stop' [FCA] violations—even if those efforts do not lead to a lawsuit or to the 'distinct possibility' of a lawsuit." *Id.* And while the parameters of such a standard may not be fully developed in this Circuit, it remains clear that any alleged protected activity under this prong "must still be aimed at stopping an FCA violation." *Vazquez v. Upson Cnty. Hosp.*, No. 5:18-cv-00073-TES, 2019 WL 5395447, at *7 (M.D. Ga. Oct. 22, 2019) (quoting *United States v. LifePath Hospice, Inc.*, No. 8:10-cv-1061-T-30TGW, 2016 5239863, at *10 (M.D. Fla. Sept. 22, 2016)).

2.    Causal Connection

To sufficiently state a retaliation claim, it is not enough for a plaintiff to allege that he engaged in protected activity and then suffered an adverse employment action afterwards—there must be a causal connection between the two. This means that a plaintiff must "'show that the harm [he suffered] would not have occurred in the absence of[,] that is, but for' his protected conduct." *Nesbitt v. Candler Cnty.*, 945 F.3d 1355, 1358 (11th Cir. 2020) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346–47 (2013); *see also Reynolds v. Winn-Dixie Raleigh Inc.*, 620 F. App'x 785, 792 (11th Cir. 2015) (discussing how

the but-for causation standard applies to retaliation claims under the FCA). To meet this standard, at a minimum, a plaintiff must show that his employer was at least aware of the protected activity. *Sanchez*, 596 F.3d at 1303; *see also Chase*, 723 F. App'x at 792 (finding no causal connection to exist where plaintiff failed to allege that his employer was aware of his protected activity). All this said, it should be noted that "[t]he showing necessary to demonstrate the causal-link part of the prima face case [of retaliation] is not onerous; the plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *United States. v. Lockheed Martin Corp.*, 905 F. Supp. 1343, 1348 (N.D. Ga. 2013) (quoting *Mann*, 49 F. Supp. at 1317).

### B.    Application to Plaintiff's Retaliation Allegations

The Court now turns to whether Plaintiff has sufficiently pled a claim for retaliation in light of the foregoing standards. Plaintiff claims that he engaged in two distinct protected activities that could have given rise to his termination. First, Plaintiff alleges that he was "terminated because of lawful acts in furtherance of his *qui tam* action against Vitas[.]" [Doc. 1, ¶ 87]. And second, Plaintiff alleges he was terminated for "his efforts to stop CCH from submitting false claims to the Medicare program[.]" [*Id.*]. As noted, Plaintiff claims the adverse employment action to result from each alleged protected activity is his termination.

#### 1.   Lawful Acts Taken in Furtherance of his *Qui Tam* Action Against Vitas

Plaintiff alleges that Defendants terminated him upon learning that he had filed a *qui tam* action under the FCA against his former employer—Vitas. He alleges that his efforts in prosecuting Vitas for its alleged fraudulent conduct constitute protected activity in the

suit he now brings against a different hospice care provider—CCH. In support of this position, Plaintiff argues that the plain text of the FCA's anti-retaliation provision does not require the alleged protected activity be taken against the terminating employer. [Doc. 35, p. 12 (citing *Cestra v. Mylan, Inc.*, No. 14-825, 2015 WL 2455420, at *11 (W.D. Pa. 2015))]. Rather, his argument is that the statute broadly prevents discrimination against an employee for simply engaging in lawful acts to stop FCA violations. [*Id.* at p. 12]. Similarly, he cites to a series of cases (non-controlling) that he claims support the conclusion that a *qui tam* action against one employer constitutes protected activity in an action against an unrelated employer. [*Id.* (citing cases)]. The Court is not persuaded.

Rather than structure an argument based on non-controlling caselaw, it might have been helpful for Plaintiff to first consider the standard set forth in this jurisdiction regarding what behaviors constitute protected activity. The Eleventh Circuit proposed a single question for district courts to consider when determining what constitutes protected activity. *See Sanchez*, 596 F.3d at 1303–04. "The question here, then, is whether [a plaintiff's] complaints of illegal activity occurred when there was a distinct possibility that she or the government" would sue the defendants under the False Claims Act." *Id.* The Court need only input the relevant facts of this action into that question's general framework to have its answer:

> Did Plaintiff's *qui tam* action against Vitas occur when there was a distinct possibility that he or the government would sue Defendants (i.e., CCH) under the False Claims Act?

The Court, upon considering only the facts as pled, easily answers "no." In his Complaint, the only efforts that Plaintiff alleges he undertook in "furtherance of" this *qui tam* action against Vitas occurred in 2009 when he initiated the proceedings.[4] Therefore, the Court finds it difficult to conclude that when Plaintiff filed his *qui tam* action against Vitas, CCH knew or should have known that there was a distinct possibility that he (Plaintiff) would similarly have sued it, an unrelated employer, for FCA violations.[5]

However, even if the Court were to give credence to this argument and conclude that the *qui tam* action against Vitas constitutes protected activity, Plaintiff still fails to sufficiently plead a causal connection between it and his termination. In fact, Plaintiff's Complaint largely requires the Court to read-between-the lines and infer a causal connection based on non-descript behaviors by CCH management and other random actors. The Court turns to the event that Plaintiff claims to be the "catalyst to [his] retaliatory termination"—the March 2018 conference call. Apparently, prior to this call, no one in CCH management knew Plaintiff filed a *qui tam* action against Vitas. In stating this, it is clear that Plaintiff is suggesting that *something* happened during this conference call to change that fact. Unfortunately, Plaintiff fails to allege any facts to show what that

---

[4] In Plaintiff's Response [Doc. 35] to Defendants' Motion to Dismiss, Plaintiff claims that he was involved in the October 2017 Vitas Settlement and engaged in the "protected activity of continuing to take lawful action in furtherance of that FCA case up to the time of the October 2017 settlement." [Doc. 35, p. 14]. However, Plaintiff did not allege such involvement in his Complaint. The Court cannot now turn to a subsequent filing and attempt to make out a retaliation claim upon these new allegations. The Court must only consider those facts alleged in Plaintiff's Complaint.

[5] Plaintiff alleges that he started his employment with Defendants in September 2016—nearly seven years after he filed his *qui tam* action against Vitas. [Doc. 1, ¶ 9].

*something* could possibly be. Instead, rather vaguely, Plaintiff claims that there were two

participants on this call who were allegedly aware of his status as an FCA whistleblower.

Then, he alleges that Ms. Grey—one of the CCH executives involved in Plaintiff's

termination—similarly participated on this call. And finally, he alleges that a month after

this conference call, he was terminated.

As stated earlier, to sufficiently allege a causal connection, a plaintiff must show that

the employer knew about the protected activity. *See Chase*, 723 F. App'x at 792 (citing *United*

*States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998) (stating that

"because of language in § 3730(h)(1) requires the employee to show that the employer had

knowledge of the protected activity and was motivated to retaliate, at least in part, by the

protected activity)). Nowhere in this sparse collection of facts does Plaintiff allege that Ms.

Grey, or any person involved in his termination from CCH, actually knew of his role in the

*qui tam* action against Vitas and fired him for it. To conclude otherwise would require the

Court to essentially fill in the factual gaps in Plaintiff's Complaint for him. Therefore, based

on these allegations, Plaintiff's retaliation claim regarding his alleged protected activity

with his former employer, Vitas, fails to state a claim under the FCA's anti-retaliation

provision.

2. <u>Other Efforts to Stop Violations of the FCA—Falsified Medical
Documentation and Certifications</u>

In his next attempt to state a retaliation claim, Plaintiff alleges that he engaged in

protected activity when he reported to Ms. Grey that Dr. Al-Shroof routinely failed to

attend IDG meetings and engage in clinical decision making. He similarly alleges protected activity in that he raised concerns about the forged IDG attendance paperwork used to cover-up Dr. Al-Shroof's absences. In turn, Plaintiff claims that Ms. Grey informed him that Defendants planned to repay Medicare for claims submitted involving these issues.

The question then is whether these reports constitute protected activity. At first glance, it appears that Plaintiff may simply be reporting to management an employee's improper conduct.  As a general matter, to allege protected activity "[a] plaintiff must do more than investigate or complain about an employer's improper conduct; a plaintiff must have specifically investigated or complained about the employer making false claims for federal funds[.]" *Vazquez*, 2019 WL 5395447, at *8 (quoting *Bouknight v. Houston Ind. Sch. Dist.*, No. H-06-1057, 2008 WL 110427, at *4 (S.D. Tex. Jan. 8, 2008); *see also Hale v. Moreland Altobelli Assocs., Inc.*, No. 1:14-cv-00065-WCO, 2014 WL 12235187, at *6 (N.D. Ga. Sept. 4, 2014). It is not uncommon that an FCA retaliation claim fails simply because the conduct alleged does not fall under the FCA. *Cervalli v. Piedmont Healthcare, Inc.*, No. 1:20-CV-2790-TWT, 2021 WL 1053537, at *4 (N.D. Ga. Jan. 5, 2021). This distinction is made difficult when "an employee's duties include reporting wrongdoing to [his] superiors," because "simply reporting that wrongdoing cannot amount to protected conduct [when] the employee is simply doing what [he] was obligated to do[.]" *United States ex rel. Parato v. Unadilla Health Care Ctr., Inc.*, 787 F. Supp. 2d 1329, 1342 (M.D. Ga. 2011).

In respect to this point, Plaintiff was the program director for the Warner Robins facility where Dr. Al-Shroof worked as the medical director. In his Complaint, Plaintiff

admits that part of his responsibilities in this role included managing all employees.
Therefore, it would make sense, that upon Plaintiff's observance of Dr. Al-Shroof's alleged
failure to comply with the internal polices of the facility as well as federally mandated code
regulations, that he would find it prudent, at the very least, to report such observations to
management. *See Mack*, 365 F. Supp. at 1380 ("Indeed, why would an employer fear that an
employee reporting non-compliance, whose job responsibilities include ensuring regulatory
compliance, seek[] to file a False Claims Act suit or report fraud to the government?").[6]

Upon review of Plaintiff's Complaint, he fails to detail any allegation that he
informed Ms. Grey about the *illegality* of Dr. Al-Shroof's behavior. True, Dr. Al-Shroof may
have violated some federal regulation requiring him to attend certain meetings, and it may
also be true that CCH lied about it and actively covered it up, but Plaintiff's complaint
never shows how this particular behavior resulted in CCH filing a false claim with the
United States. *Hickman v. Spirit of Athens, Ala., Inc.*, 985 F.3d 1284, 1289 (11th Cir. 2021) ("An
organization might commit, and its employees might believe it has committed, any number
of legal or ethical violations—but the [FCA's] retaliation provision only protects employees
where the suspected misdeeds are a violation of the [FCA], not just of general principles of
ethics and fair dealing."). Accordingly, that reporting of unethical or even fraudulent

---

[6] However, this is not to say that such internal reports, as exampled here, can never constitute protected
activity. Where an employee stresses the unlawfulness of a defendant's action and warns them of the
potential to incur civil or criminal liability as a result, then this could clearly prove sufficient to constitute
protected activity. *See Sanchez*, 596 F.3d at 1304.

behavior doesn't amount to "protected activity" under the FCA. And without the FCA link, this claim fails. *Id.*

However, even accepting this internal reporting as protected activity, Plaintiff once again fails to establish a causal connection between it and his termination. All of these alleged reports to Ms. Grey occurred while Plaintiff was employed at the Warner Robins facility in 2016—two years before his termination in 2018. There are no further facts alleged regarding how these reports resulted in his termination. Therefore, the only way to establish a causal connection in the absence of any other facts, would be to allege temporal proximity between the two. "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that temporal proximity must be 'very close.'" *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *see also Wallace v. Ga. Dep't of Transp.*, 212 F. App'x 799, 802 (11th Cir. 2006). And a two-year period is simply not very close. *See Faircloth v. Herkel Invs. Inc.*, 514 F. App'x 848, 852 (11th Cir. 2013) (requiring plaintiff to demonstrate that there was less than a three-month gap between his complaint and termination to establish causation based on temporal proximity); *see also Thomas v. Cooper Lighting*, 506 F.3d 1361, 1364 (11th Cir. 2007). Based upon these cases, the Court rejects Plaintiff's argument that he can establish temporal proximity by merely showing that his termination occurred at some point after the protected activity.

3.  <u>Other Efforts to Stop Violations of the FCA—Claims Regarding Non-Terminal Hospice Patients</u>

In his final attempt to plead a retaliation claim, Plaintiff seeks to satisfy the first element of the prima facie case by alleging protected activity when he reported to Ms. Grey that Dr. Al-Shroof knowingly admitted ineligible (or non-terminal) patients into hospice care upon the instruction of CCH management. Plaintiff claims that Defendants billed Medicare for these patients, and therefore submitted false claims. He further claims that to prevent the continuation of this practice, he recommended to Ms. Grey that she discharge these patients from hospice and that Defendants then take action to repay the Medicare program. Defendants argue that Plaintiff fails to allege protected activity in this regard, arguing that when a hospice provider submits a claim based upon a medical director's clinical judgment regarding a patient's terminal diagnosis, such a claim cannot be false or trigger FCA liability as a matter of law. *See* [Doc. 39, p. 9 n.6 (citing *United States v. AseraCare, Inc.*, F.3d 1278 (11th Cir. 2019))].

Upon review of both parties' arguments, the Court finds it necessary to note once again that protection under the "other efforts" prong of the anti-retaliation provision is more expansive than that under the first prong. The Eleventh Circuit has held that "[plaintiffs] are, at a minimum, required to show that the activity they were fired over had *something* to do with the [FCA]—or at least that a reasonable person might have thought so." *Hickman*, 985 F.3d at 1289.

21

Here, Plaintiff expressed his concern about the admission of ineligible hospice patients with the explicit recommendation that action be taken to repay the Medicare program. If Plaintiff recommended repayment as the appropriate response, it follows that Plaintiff suspected that some claims had originally been falsely submitted to Medicare. While Defendants argue that a claim cannot be false if submitted upon a medical director's clinical diagnosis, such an argument is not relevant to the facts here. Plaintiff clearly alleged that Dr. Al-Shroof did not make a clinical determination founded on medical knowledge, but instead diagnosed patients as terminally ill upon *explicit instruction from CCH management*.[7]

Regardless, even assuming that this reporting constitutes protected activity, Plaintiff once again fails to plead facts showing a causal connection between it and his termination. He made these reports to Defendants' CEO, Ms. Grey in 2016.[8] But, Plaintiff was not terminated until 2018. He alleges nothing else in his Complaint to suggest that these reports caused his termination.[9] Therefore, Plaintiff is left, once again, to rely on a strictly temporal

---

[7] Plaintiff does not appear to allege that Dr. Al-Shroof wrongly certified non-terminal patients for hospice care based on his own medical determination. Rather, he very clearly states that the only reason he certified ineligible patients as terminal was due to pressure from CCH management. [Doc. 1, ¶ 11]; *see United States v. AseraCare, Inc.*, 938 F.3d 1278, 1297 (11th Cir. 2019) ("[I]n order to properly state a claim under the FCA in the context of hospice reimbursement, a plaintiff alleging that a patient was falsely certified for hospice care must identify facts and circumstances surrounding the patient's certification that are inconsistent with the proper exercise of a physician's clinical judgment.").

[8] Plaintiff's alleged reports to Ms. Grey regarding Dr. Al-Shroof's admittance of non-terminal patients into hospice care occurred in 2016. Plaintiff fails to allege that he made any specific reports regarding this issue after 2016. *See generally* [Doc. 1].

[9] Plaintiff claims that the telephone conference in late March 2018 was the cause of his termination. *See* [Doc. 1, ¶ 80 ("[Plaintiff] participated in a conference telephone call . . . that was the catalyst to [his]

connection to suggest the requisite causal connection between his protected activity and his termination. However, as discussed in detail above, a two-year gap in time (with nothing more) cannot support an inference of a causal connection. Therefore, without a causal connection, the Court concludes that Plaintiff failed to state a retaliation claim regarding his reports from two years earlier that patients were falsely certified as eligible for hospice care.

## CONCLUSION

For the reasons discussed above, Defendants' Motion to Dismiss [Doc. 28] is **GRANTED**.

**SO ORDERED**, this 2nd day of June, 2021.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**

---

retaliatory termination. "). And even then, he fails to provide sufficient facts showing how this call relates to a protected activity that his employers knew about. *See generally* [*id.* at ¶¶ 77–84].